Your Honors, the second case of the draft court is D-24-0191, DML Development LLC v. Village of Hawthorn Woods On behalf of Mr. Kelly, on behalf of Ms. Thomas, and on behalf of Mr. Don R. Sanders And you can move that microphone to where you are as opposed to, yeah, thank you. I think it will pick me up. I hope so. You know, this is all recorded and it goes on the website. You need to hear what you're going to say not only here but on the website. Fair enough. Justices, may it please the Court, my name is Tim Elliott and I'm pleased to represent the Village of Hawthorn Woods this morning. There are a number of issues in this case, but I want to go straight to the trial court's award of damages to PML. Very simply put, those damages should never have been awarded by the trial court. They are contrary to law and they were woefully unsubstantiated by the evidence. I want to start with the issue of law, and that's the new business rule. The trial court utterly ignored the new business rule, both in the original proceedings and then when the case came back down on remand. The new business rule is a well-established doctrine under Illinois law and it is straightforward. A plaintiff that is seeking lost profits has to support its claim with actual, real-world historical data, either from the plaintiff's own business, if it's an established business, or from a proxy business, a similar business operating in a similar environment, if it's a new business. That's been the law in Illinois for a long time, and in our papers we really focused on the Ivey case, not only because that's the most recent formulation and it's controlling, but also because the interplay in Ivey, both at the appellate court level in the first district and at the Supreme Court level, is really illuminating on this case. There were dissents at both levels. Justice Overstreet dissented at the Supreme Court level, and Justice Overstreet's dissent resonates with what PML is asking you to find. The majority on the Illinois Supreme Court articulated the rule, as I just did, that you have to support lost profits with actual, real-world results. What is DA Development? Pardon me? DA Development. DA Development is a separate company with the same principles. I'm not sure that the DA Development is relevant to the new business rule, but I will get to there because I want to be responsive. Oh, so you don't think it's anything to do with the business rule? I do want to be responsive because you've gone straight to a point that I'm going to get to a little better. The people who formed PML have an existing business called DA Development. PML is a single-purpose entity that they set up for this business, and what the evidence showed is they set it up in name only. PML was the contracting party with the Village of Hawthorne Woods, so liabilities under that contract would reside with PML. But if you look at every business document from start to finish in this case, they're from DA Development. The internal documents, the third parties that are contracting, that are delivering fill to the property, the bank statements, the IRS forms, everything says DA Development. Oh, right, so DA Development, for purposes of the new business rule, wasn't an existing corporation or company before PML. A hundred percent, correct. A hundred percent. And so if they wanted to comply with the new business rule, it would have been very easy for them to have come to the trial court and said, hey, as it turns out, we have existing fill projects in and near the Village of Hawthorne Woods, and here's their profits, and here's their losses, and here's their costs, here's their revenue. And so you can substantiate this three-page document. This is the projection. This three-page projection is the foundation of all the damages that are awarded. And what the new business rule requires is that they provide something from the real world that's going to say that these numbers are actually reasonable. You just said that all the documents come from DA Development, and you know that's where they're coming from. Why don't we know that this is where this is coming from? I'm not sure I follow. Well, you said everything that happened, this, we have too many initials in today's court calls. PML. This PML development is the new business just for this particular purpose. Correct. And it's under the umbrella of the DA. There's some, it's common ownership. Okay. But you said the documents all say DA Development on them, or there's, you can see the fingerprint of DA Development. Why can't we see a fingerprint of DA Development on this document? You could if they had presented that evidence, and they didn't. But was it shown? They, for this project, this Phil project, all of the documents say DA Development, which is one reason, a significant reason why they shouldn't lose, because PML didn't actually incur the damages and expenses DA Development did. For this project, they produced all the DA Development data. But what they didn't do, and what they're required to do under the new business rule, is show the financial performance from those other sites. Let me ask you this question with respect to the new business rule. You're relying on IV. The plaintiffs are relying on Millex, the drug case. How do you distinguish that case from the case before us? Millex is a drug case from, I think, 1992, where Justice Woodward issued the decision. In that particular case, it was an established product. It was a Comid. It was a Comid drug that was about to, the pads were going to expire, and so it was going to be pushed out as a generic drug. Millex was not able to work with its partner to push out its version of that generic drug. So what the expert in that did, a gentleman by the name of Price, is he went to the other people who had pushed out that generic drug, and he got their actual data for literally the same product, and he presented to the court the actual numbers that other people had realized from that product and used that as the proxy. That's what didn't happen here. There is nothing in the record anywhere to show costs, revenues, or profits from any other site. Nothing. In their papers, they say, well, we did look at other projects, and respectfully, that is just grossly misleading because they looked at the other projects for one purpose. That was fill rate. They looked at the other projects to see how quickly can fill be delivered to a piece of property. That's the only point of data they got from those other projects. What they didn't present, and what they notably avoided presenting to the trial court, was any of the financial results from those other projects. What the new business rule required them to do is simple. This is the three-page projection. They needed to come forward and say, trial court, here's another fill project that looks a lot like this one, and here's the actual financials, and so our cost projections can be substantiated by the real world. Our profit projections can be substantiated by the real world. They didn't do it. So let's move then to the proof of the damages. How did Burton's calculations not prove what they needed to prove? I mean, the court found them credible. Where do we go from there? Well, the new business rule, I can attack both, and I will. The new business rule is a rule of law. Right. Okay? And it's very straightforward in saying experts may not guess, and this is a quote from paragraph 30, experts may not guess the amount of potential lost profits where there is no historical data to demonstrate their likelihood. That's the rule of law. So I don't need to have, on that, I don't need to worry about the credibility findings. What he did, what Mr. Burton did, was he started with this three-page document, which, let's be honest, was a guess. This was created before the contract with the village was ever signed. This was a guess. What he did is he started with these numbers, and then he calculated what he contends were the actual costs, and then he said everything in between, the difference between the projection and the actual cost is the damages. But what the new business rule requires is you have to substantiate the projection. You have to show that these numbers in the projection are actually achievable and have been achieved by someone in the real world. That's what they didn't do. Now, on the other point. Did you call an expert? We did not call an expert below, nor do we think we needed to. We chose to cross-examine Mr. Burton and to rely on the new business rule arguments. And, you know, as I said, on the new business rule, unless they can point you to something in the record, which they will not be able to do, Mr. Stampin's going to come up and he's going to have his chance. Unless they can point you to someplace in the record where they show you a real-world, and I'll use the words from Ivy, historical data from an actual project with financial results to substantiate this, they can't win under the new business rule. And it can't be some throwaway generic sentence that their experts looked at other projects. He has to show you financial results from another project, actual real-world data. And, by the way, his experts admitted, PMO's experts admitted they didn't look at those other projects. If you read pages 2193 and 2194 of the record, you'll see the questioning of their expert, Burton. And he's asked the question, what did you look at? Here's his answer. Well, I'm sure we didn't talk about revenue. It would have been just the pure facts of the timelines of the project. That's their expert. And what he's saying is we didn't look at the revenue from those other projects. We were looking at the fill rates. That's the timeline. Then you go to page 2194, the very next page. And in response to a question about whether they looked at the costs from those other projects, Mr. Burton says, I'm not, I'm not 100% sure, to be honest with you, whether they looked at the costs. They then called another expert up. That was Mr. Nesser. And I won't recite his testimony, but it starts at page 2315 of the record and goes through about 2322. And he's asked about everything that he did to evaluate the costs for this project. And he talks about everything except other similar projects. He said they looked at databases, national marketing, labor rates. They did everything except what they're required to do under the new business rule. Were the 30 or 40 boxes of invoices relied upon by GLEADS to calculate, PMF, ounce damages turned over to the village in Discovery? They were turned over. There were boxes and boxes and boxes of invoices that were turned over. Here's the problem. Here's the problem. We don't know which of those invoices went into his calculation and which ones didn't. There were 30 or 40 boxes of invoices. They presented very specific numbers. Their expert got up and said, these are the numbers to the dollar. In fact, I think in one case to the cent. We said, okay, so of those 30 or 40 boxes, what invoices are included, what were excluded? How did you get those specific numbers? They never said. They didn't show their math. And we're kind of moving away from the new business rule on this into the other areas, but that's a separate problem because even if they can get past the new business rule and they're eligible to recover these lost profits, they still have an obligation to show a reasonable basis for computation. That's been the law in Illinois forever. They have to show how they calculated it, and they didn't. What he said at trial was he started with the general ledger and then backed out a bunch of costs and landed at his number. Well, we've showed that's mathematically impossible. The general ledger, the document that they cited, has $5.9 million of costs listed. You can't start with $5.9 million, deduct a bunch of costs, and land at $9.34 million, which is what he says he did. The financial statements, very similar. Their financial statements list $9.7 million in expenses. But there are things in there that have to be backed out. Their financial statements list over $1 million in legal costs on this case. Their financial statements list a land rover, bank charges, $333,000 of something called PML expense. You can't start with the financial statements, make all the deductions that he claimed he made, and land at $9.34 million. So the question then becomes, if he didn't do that because it's mathematically impossible, then what did he do? And the answer is you can't tell because he never showed his math. He never presented a listing of the invoices and said, this is how I got these dollar-specific numbers. He didn't do it. He was asked at trial, did you ever do this, and I think he gave an answer to the effect of, I think I have that list on my desk somewhere. They never presented it. Now on appeal, on appeal, they're making an argument that is the opposite of what they said below. In the trial court, they introduced the general ledger and the financial statements and a bunch of sample invoices to show, to provide a foundation for what their expert did. They offered that into evidence below to show this is the foundation of his analysis. Now that it's been revealed that those don't work, they're distancing themselves. Finish your thought. The sample invoices, as we've shown, include dozens and dozens of invoices for thousands of dollars that just patently don't relate to this project. They can't. Many of them predate this project. So those sample invoices cannot be samples of damages. They're now saying, oh, we don't rely on the sample invoices. Yes, they did. That's why they introduced them into evidence, because they said these are samples of what he's considering. Let's change gears since you're running out of time. Okay. You indicated in your brief somewhere that the Supreme Court told you that you were entitled to damages regarding the money for the P&L's failure to convey property. Where in the Supreme Court opinion does it say you're entitled to money damages for that? I don't think we said we're entitled to it. What we said is— I thought you said the Supreme Court said you're entitled to it. The Supreme Court gave the trial court authority to do that. So what the Supreme Court did in paragraph 67 is they said, this case needs to be remanded for calculation of each party's damages. And then in paragraph 69 it went a little bit further and said, although we could remand to the appellate court, we will remand to the trial court to consider the village's damages, including an additional evidence you're hearing on the village's damages. That's what the Supreme Court gave the authority of the trial court to do. Okay. So why didn't you seek to amend your complaint and present evidence of money damages when you moved to reopen the proofs to show the sale of the parcel of that property? In hindsight, we could have done that. So what did you expect the trial court to do just to figure that out? At that point in time, the case had been under submission for, I think, seven months, seven or eight months, something like that. The thought was that the trial court was probably very close to issuing a decision, and so they made a record of that particular issue. And depending on what the trial court did, they could have sought to amend to conform to the proofs at that time. They didn't. We acknowledge that. But our point with that is we tried for years to get specific performance. And at every turn, the trial court said, you're too early. Because we kept pointing out, they're not paying the taxes, they're not paying the taxes. And at every point, PML told the trial court, don't worry, we're going to pay the taxes. And at every point, the trial court said, you're too soon. Their time isn't up. That expired, as Your Honor correctly noted, in September, maybe October, but September, October of 2020. The trial court issued its decision in November. So you're correct. We had a six-week to two-month window to do something. Our point on remand is it cannot be that in the entire seven or eight-year, at this point ten-year history of this case, that that two-month window is the only chance that we could have to shift gears. Because we spent the first seven years seeking specific performance, and we are entitled, we submit, to some remedy for what is an egregious breach of this contract. The only reason the village entered into this agreement was to get the property. And so it would be extremely unjust, we submit, to say you had that limited window, tough luck. Liberal pleading is permitted under Illinois. In this case, not allowing that amendment on remand, which the Supreme Court clearly contemplated and gave him the authority to consider, we believe is a grossly inequitable result. Thank you. Thank you, Counselor. You'll be back at some point here. All right. Mr. Sampin. My pleasure, Court. Tom Sampin on behalf of PML Development, Your Honors. There's a lot of issues here. I'll do what I can to cover as much as I can. I might skip around a bit. If there's particular issues Your Honors would like me to address, be sure to let me know as we go along. Just on this last point, there was nothing in the Supreme Court decision that remotely required the district trial court to reopen the evidentiary record to allow in new evidence on a claim that had never even been pleaded. I'll get more to that later on. But the Supreme Court left it entirely up to the trial court as to whether any further evidence, any further hearing would be necessary. And the trial court found it wasn't necessary. But there wasn't anything in the Supreme Court's decision that said they couldn't have another hearing. Didn't prohibit, but it left it entirely to the discretion of the district court. Well, how should we read mandates? I said, how should we read mandates, whether it's from our court or the Supreme Court? Do we read them liberally? Do we parse words? Do we say, well, they didn't say we couldn't do that. Is there a rule? And how should we read those? Well, I think you have to read it fairly literally. The court left it entirely to the discretion of the trial court. And the trial court prudently exercised its discretion. So it's a matter of discretion with the trial court. Let me start more at the beginning. Mr. Elliott started talking about the new business rule. Let me say a few words about that. I think it's a complete red herring in this case. As we pointed out in the briefing, the new business rule does not provide a bar to a new business to obtain damages. It's really an offshoot of the rule that damages have to be proven with reasonable certainty. And it has no application at all where there's an established market for the product at issue and the business is not new. And in this case, PML was stuck. Wasn't this PML developed just for this particular issue of dumping the dirt on this property? I think for this particular project, yes. But that doesn't mean its business was new. It had an established Mr. Powell, who was the owner of PML, had an established business. Your Honor correctly pointed out the daily development business. Several other projects in the same area, Mr. Powell's evidence had been in this business the last 27 years. So the name PML may well have been new, but the business was not new. Well, how does PML's explanation about DA development documents, that it was a legacy stationary issue, explain the various invoices and IRS documents that are addressed to DA development? Well, I can certainly address that, Your Honor. Again, not much of an issue in my view. Mr. Powell testified about the software situation, that his company shared software with DA development. The trial court found that there was a sharing of office space. There was a sharing of employees. There was a sharing of equipment. But the DLEADS experts went through all of these documents. They eliminated those documents that were not specifically attributable to the PML project. And so that is the safeguard here. And all these documents were made available to the village. And what it does here on appeal, it points out the specific items and says, well, this item should not have been included in the damages. That item should not have been included. They don't present any evidence that it was included, yet they could have run their own analysis and figured that out for themselves. Well, if I heard counsel correctly, it sounds like there were boxes and boxes, I think, was his description. All of those boxes had relevant matters in them that should have somehow been classified, identified. What was the purpose of all of those things? There's evidence that there are 30 or 40 boxes of invoices that the PML experts went through. And that was part of the analysis that they made. I was going to get back to that, Your Honor, with respect to what was the experts' methodology here. The methodology was not simply to rely upon the ledgers and then make a few adjustments. It was not simply to rely upon the financial statements and make a few adjustments to financial statements. What it involved was certainly that these experts relied upon those documents, but that was only a part of the analysis. They actually began their analysis by developing their own budget for this project based upon their expertise, historical data, and other projects in the area. What historical data did they rely on? I'm sorry? I apologize. What historical data did they rely on? Well, they had their own charts and manuals to refer to, but they also relied upon historical data from other projects in the area. I'm actually glad that you brought that up, Your Honor. Mr. Elliott read from a portion of the testimony, but the Glieds experts did, in fact, rely upon Mr. Powell's other projects in the area. If you look at pages 2063 to 2064 of the record, there's testimony here. Did the Glieds review any historical data from past projects involving Dan Powell? Answer, yes, we did, yes. I think about those five different projects. And why did you review historical data from the past projects? Answer, we looked at these past projects to try to identify past performance, what Dan Powell had achieved in past projects in the local area. So that's just one small excerpt of testimony. But doesn't this rule, if it's applicable, require more specifics than just we looked at? Doesn't it require that that historical data be itemized or classified or something other than, yeah, we looked at it? No, there's no rule required to be itemized. I mean, what the Glieds experts did was to go through these 30 or 40 boxes after developing their own separate set of figures which they felt were reasonable to achieve. And then they compared those figures with the reasonableness of PML's own anticipated costs. And at that point, they went through these 30 or 40 boxes. I won't say that they went through, I won't say that they looked at every document. They looked at invoices in excess of $1,000, but they pretty much reviewed all of those documents. And at that point, they met with PML and they discussed which invoices should not be included in the estimates of costs, estimates of damages. This was a lengthy exercise. They went through all these boxes, and all of the materials were made available to the Williams at all times. Well, I recall when I was on the trial bench that I was dealing with a truck driver who was trying to establish his expenses, and he put on my desk right in front of me four shoeboxes full of receipts. Yes. And I said, take them back and do something with it. It is not my job to go through them and decide what applies to what. How can you give – excuse me. I said, why not? I know. No math. How could you give that many boxes and expect them to go through them? Well, our experts went through them, and then they prepared an expert report. They had work papers that they had. We prepared charts and summaries that we presented at trial, and it was those materials that we presented at trial as we were entitled to do so under the Illinois Rules of Evidence, Illinois Rule 1006. Were those demonstrative, or were they actually introduced? Well, they were demonstrative exhibits. As the rule says, you can rely upon charts and summaries at trial. We introduced them to the witnesses. There was no objection to the testimony that came in. And all of these materials were represented and were provided to the village prior to the trial. They had the opportunity to go through them themselves, make their own studies, make their own expert review of those documents, but they didn't do that. Why would they rely upon PML to go through those documents, which we did. And as I've indicated, when there's a – when documents are so voluminous in nature as they were in Your Honor's situation, Judge, Justice Hutchinson, it's perfectly permissible to use charts and summaries. I don't doubt that, but the question is if they were demonstrative, I'm not seeing them. They're in the record. They were introduced, Your Honor. Okay. Well, that's different than just demonstrative. They were actually evidence in the case. Demonstrative would be they would just be sort of window dressing, but that's not what they were. Well, they weren't window dressing. I mean, there were exhibits that were used at trial. Well, with respect to the new business rule, let me comment. You don't think that the new business rule is an issue. You think it's a red herring. I think there's a complete red herring here. So how do you distinguish Ivy that they rely upon? Well, Ivy involved a new business and new products. And the product here was fill rates or fees charged for dumping fill upon the. And they had done this before. Absolutely. Mr. Powell was in the business.  D.A. Development was in the same business. So it's simply not a new business. It was the same business under a new name. The same business under a new name. So was Mr. Burton looking at the previous invoices and comparing them to the invoices in this business? They certainly met with Mr. Powell. And it's my understanding that they went through Mr. Powell's prior businesses for the purpose of determining how the business operated and what deadlines and what costs were involved in the prior businesses. Yes. Since we're moving along, the prejudgment interest is an issue. I'm not saying we're going to get there. We're not going to get there. But it's in the briefs. I want to discuss what you think is the starting point of prejudgment interest. I think we're talking about post-judgment interest. Excuse me. Post-judgment interest. The starting point is March 11, 2021, Your Honor. The original judgment. The original judgment along with the fees and costs, yes. That's the starting point. Not after it's been remanded. Well, that was before the first appeal. That's when the damages were submitted. That's where the post-judgment interest starts.  I wasn't going to address that further. I can. I think there are probably other issues that You go where you want to go. All right. We can talk about the mathematics argument. Where's the math? The math is in the expert reports, the work papers, the charts and summaries we presented at trial, and the 30 or 40 boxes of documents, all of which were made available to the village, and which the village simply didn't take seriously. So if there's anyone to blame for not being prepared for trial, it's the village here that declined to use an expert to review those documents and come up with its own estimates of what the costs should have been. And that was the whole purpose of the GLEADS experts' review of those documents, to compare what should have been based upon the GLEADS experts' own calculations, compare that to what the costs actually were. And that's where the figures come from. As far as damages for failure to convey are concerned, I don't think I need to spend much time on this either. The village is not entitled to damages, Your Honor. Right. They did not plead. They did not plead, and they're not entitled to damages. And so we're not supposed to give advisory opinions. We're not supposed to advocate. So if they're not pled, there's no reason to discuss it, correct? Or that would be your position? Yes, certainly our position. I'll move on to the next issue with that explanation, Your Honor. Who was the prevailing party? Attorney's fees, you're talking. I'm sorry? You're talking about attorney's fees? Attorney's fees and costs. Yes. Well, that's a good question. Court costs versus litigation costs. Let me talk about that. Slightly different issue, but it has to do with what costs are available here. The trial court allowed, as Your Honor is aware, court costs. The development agreement itself talked about fees and costs for the litigation. The development agreement said nothing about so-called court costs, and we think it was error for the court to construe costs in the agreement as court costs when the document itself talked about fees and costs for the litigation. And there's no definition of court costs that would sort of capture those litigation costs or vice versa? I mean, they're totally separate. Well, we computed the fees and costs. We computed the court costs, but we also computed the litigation costs. And the village says, well, you're not entitled to those because court costs are all that's available in Illinois. But that's not the case. We acknowledge the fact that the term costs can be ambiguous, but to the extent there's any ambiguity, the contract has to be construed against the village. The village, it's very clear, was the party that drafted this contract. Wouldn't it be redundant to say fees and costs of litigation because attorneys' fees are a cost of litigation? Right. Attorneys' fees are one cost of litigation. Right. My point is then it would be redundant. But if we assume it's court costs, then it makes more sense. But we're not talking about court. Attorney fees were actually awarded. They were only awarded for the trial court proceedings. And that's another issue I'll get to with respect to our cost appeal if I have time, Your Honor. But litigation costs such as expert fees, such as deposition costs, such as the cost of everything else, exhibits, copying costs, all those things are litigation costs that were necessarily incurred in connection with this litigation. Those were not allowed. And because the statute itself provides for court costs, including the term costs, in the agreement would have been redundant. And so to give it its meaning as it should be given, to give meaning to that term cost as set forth in the contract, we should be talking about litigation costs. As far as who the prevailing party is, the courts generally look to two factors to determine who the prevailing party is. They look to the amount of recovery, the comparison of the amounts of recovery as between the parties, and they look at the significance of the issues. And both of these factors weigh in favor of PML. With respect to the amount of recovery, our recovery in trial court proceedings was $5.3 million. PML's recovery was $408,000. Their recovery ultimately was only about 7% of what PML was awarded. We cited case law where the difference, it was the... Right, and even though the court found that both sides, both parties had breached in some way. Yes. You're saying we overlook that particular statement and basically look to recovery? Well, I mentioned two factors. One is the amount of recovery. Right. Certainly PML is favored on that point. As to the significance of the issues, the village had five counts in their complaint, in their counterclaim. They prevailed on one, and that was the drawdown account. And the amount of the deficiency in the drawdown account was about $58,000. As pleaded, it grew by the time the judgment was entered. It was simply a matter of bookkeeping determination to decide how much should be awarded for the drawdown account. The amount of recovery was $200,000 in connection with Kruger Road. And that amount was set forth in the contract itself. So the village's investment of time and effort to develop its damages in this case was modest at best. You can contrast that with PML. We had substantial expenses, lots of documents, lots of exhibits. We had lots of money spent on experts here. There was a lot of expertise necessary for the attorneys at trial. And the village is— But how does that make your issue significant? It makes— You could spend a lot of money to win five cents on a very simple issue. Why is it significant? It's significant because we ended up with a $5.3 million judgment at trial. That's why it's significant, Your Honor. But that's the same thing you already said, amount we should consider. And then you said the significance of the issue as a separate point. My question is why are your issues significant? Very significant because we established a clear breach of contract by the village. We established clear interference with this contract by a municipality. I consider that to be a very significant issue. Okay. Is that my time? It is, but you can finish your thought if you want. Were you relying on—are you relying on Pepper's instruction in determining whether or not you were the prevailing party? I think that's one important case. Yes, I think that's— He talks about significant issues. It's the most recent case in Illinois that analyzes what is a prevailing party. Yes, Your Honor. There's more to cover, but I'll stop there and do what I can to rebuff you. Thank you. Thank you. Mr. Elliott. Thank you, Justice. I want to go back to the new business rule, which I really view as the legal gating issue in this case. Let me ask you a question since that's where you're going. What exactly—my shoeboxes were bad enough, but what exactly did you do with those 30 or 40 boxes? We reviewed them. And first of all, most of the boxes were fill tickets. They weren't 30 or 40 boxes of invoices. They're mostly fill tickets from trucks that have been to the property. But the problem that we had is, okay, they've got 30 or 40 boxes. What the heck makes up their damages? That's their burden to show it. And sometimes it helps to take a step back. PML introduced into evidence a general ledger that showed $5.9 million in costs. $5.9 million, their general ledger. Their expert suddenly shows up at trial and says, actually, we've got $9.34 million in costs. But I can't tell you how we got there. It's all in the boxes. I can't tell you what we included in the boxes and excluded in the boxes. It's all in the boxes. Okay, right there, right there, they have fallen short. Because the law in Illinois is you have to show reasonable computation for your damages. You can't say, even though our own internal document shows we've got $5.9 million in costs, we're going to say $9.3 and you go figure it out. That's their burden, not ours. But then it gets worse because they provided the sample invoices. Well, if you want to get a flavor of what we consider, look at this. We've worked you through that. And these are their sample invoices. They picked them. We didn't pick them. They picked them. Their experts said at trial, this is what I consider. Costs from other projects. Costs from 2012 before this project started. Invoices for engineering at other sites. I mean, the list goes on and on. Labor costs that predate or say on the face of it, they reference other sites. And every one of them talks about a different company, DA development. Every one of them. And I don't mean to get agitated, but I just feel that their position on this is so disingenuous. What you just heard was a statement that DA development and PML are the same company, different name. I wrote it down. That's what he said. Same company, different name. That's not what they told the trial court. And the trial court, they said, DML is a legal stranger to all of this. Because at one point, the village came into the trial court and said, hey, there's a lot of environmental issues on this property. There's a lot of issues going on. And the trial court said, those are all for DA development, different company. That's what they said below. This has been set up so that PML was a single-purpose entity with no assets but holding the liabilities under the contract. And they operated through a different company. And they're now trying to claim that all of these costs are PML costs, and they're not. They set this up so that the liabilities were with one company and the assets were with another. When we got our original summary judgment granted on the failure to convey the property back in, I think, 2017, the argument we heard was, well, PML doesn't have the money to pay that. Of course it didn't, because DA development had the money to pay it. They set this up in this way, and this is such a disingenuous damages theory. Again, their documents say that their total costs were $5.9 million, and after a full trial, an appeal, a remand, and now back again, they can't show you the list of how that was calculated. Well, can't PML hire other companies such as DA development to do some of the work, and that would be appropriately identified on this three-page document? They could. They could 100% do that. Or DA development could advance certain costs. Companies do that all the time. But that's not what they told the trial court. They told the trial court, this is just a stationary mistake, and what they failed to present to the trial court was any of the financials to show related party dealings between DA development and PML. So if DA development was advancing certain costs, there should be an intercompany transfer of some sort of transaction to reflect that. They didn't show that, because that's not what happened here. That's not what happened here. It's their burden, not ours, to show which specific documents in those 30 or 40 boxes make up their damages, just like it was the truck driver's burden to show you which of those three or four shoe boxes. They didn't do that. Instead, they just overwhelmed the trial court with huge numbers. Well, let me be clear. I handed them back to them and said, I'm not doing this, and they didn't appeal it. So who knows if I was right? And in this court, in this particular case, we cross-examined their expert at length. What about this invoice? What about that invoice? How about this expense? That can't be an expense. And we got responses like, ah, I might have included that. I might have excluded that. Not sure. I probably excluded that. There's no specificity at all, none. But I want to get back, and that's on the facts, that strongly suggests to us that these are made-up damages that can't be substantiated by their own internal documents, something, by the way, that we feel the trial court erred badly in. That doesn't pass the Judge Bauer's five-day-old dead fish test. But they also lose on the law, and I want to go back to the new business rule. The position that Mr. Sampin articulated is precisely the position that was rejected by both the Supreme Court and the First Appellate District, and that's why I was trying to talk about those dissents up front, because the position he articulated is, look, there's a general rule in Illinois that you have to prove up your damages with reasonable certainty, and lost profits are no different. That was rejected. And if you read the dissent by Justice Overstreet and the dissent by Justice Walker in the First District, both of them were saying, hey, I don't think you need to show actual historical data from an existing business. I think you can look at market data. I think you can have expert testimony. And those views didn't prevail. That's not the law in Illinois, and that's important, because that's the argument they're making. What case are you talking about?  Ivey. I'm sorry, Ivey. I should have said that. I apologize. I think the other argument that you tried to hear him make is, hold on, PML is not really a new business. It's really DA development, just wearing a different hat. That also doesn't pass muster. It's called the new business rule because it presents a pretty big obstacle to new businesses, but anybody trying to establish lost profits in Illinois has to support it with historical data. An established business can do that by presenting their past results, actual results. A new business, by definition, has to go find a proxy somewhere. So even if for a moment you accept the argument that PML is really just DA development in disguise, they still have the burden of showing that DA development actually has ever accomplished results like the ones that are in that three-page projection. But DA development isn't a new business. It's not, but any business, established or otherwise, any business has to present actual historical data, and that's in Ivey. Experts may not guess the amount of potential lost profits where there is no historical data to demonstrate their likelihood. That's not limited to new businesses. Established businesses just have an easier time because they can go back to the pre-dispute era. Well, they're saying that this is an established business with DA. Right?  So where are the actual historical data from what DA has captured? In those 30 boxes. Pardon me? In those 30 boxes. Well, it wasn't there, and I kind of threw out a challenge when I was up here the first time to say, can they cite you anywhere in the record where they presented the trial court with actual financials from another site? Hey, here's DA development's results from the site just across the street from this one. And as you can see, we captured… Did the expert testify to that? Pardon me? Did the expert testify to that? Nobody testified to that. Nobody testified, and they can't cite you to anywhere in the record. Instead, they did what I predicted they would do. They gave you a generic reference to where their expert said, we looked at other sites. They looked at other sites for, and I wrote this down, for data and performance. They didn't tell you what kind of data and performance, did they? Because what they were looking at was the fill rates. Their experts did not look at the revenues or the costs or the profits from those other DA development sites. They didn't do it. And even if they did do it, which, by the way, they said they did at trial, they never presented it to the trial court. That's their burden to show actual real-world results. This gentleman in 2012 sat down before he even formed PML and said, I think I'm going to capture a 64% profit margin. I think I'm only going to have costs of $3.2 million. Does anyone know today whether that's even remotely achievable in this industry? They haven't presented a real-world example where that's ever, ever happened. And whether they're a new business or an established business, that's their burden. That's IV and that's all the other cases. Unless your honors have further questions, I will see you to the bureau. Thank you. Thank you, Mr. Elliott. All right, Mr. Champin. May I please record? I meant to bring this up earlier, but talking about the new business rule, Mr. Elliott keeps talking about profits have to be proven with historical data. We're not talking about profits in this case. The large bulk of PML's damages were the result of increased costs. And we pointed out in the briefing that there's no case that says that the new business rule, even if this were a new business, and it's not, no case that says that the new business rule applies to costs. Costs are easier to determine than revenues, which you haven't yet received. So that's another reason why the new business rule simply does not apply here, because we're talking about increased costs, which it leaves experts determined as a result of the village's interference with this project. I think Mr. Elliott's main problem is that his folks did not go through the 30 or 40 boxes. And you have to do that in order to determine what are the increased costs here. You have to compare those invoices that they went through and determine are they attributable to this project, and what was the reasonable cost incurred by PML. And it leaves experts. They did all that. And the village's problem is they didn't have an expert. They didn't have any way to counter the testimony introduced by our experts. And by the way, I'm – go ahead, Judge. These boxes, were they in chronological order? Were they in business – was there a name of the project on them that could be classified so that they could look at them? Or were they just 30 boxes of paper? I personally haven't seen the boxes, Your Honor. I don't know if they had names on them, but I'm sure as a business entity that they had names and there were probably files in there. But it doesn't – that's all the more reason why it was important for experts to go through them. If they weren't organized, if they were just a pile of documents, that's all the more reason why you need some expertise here. Was there ever any complaint about a discovery violation? No, not that I'm aware of, Your Honor. I haven't seen that. I haven't seen that in the record. I haven't seen that in the briefing. There was no complaint about the lack of documents. About the failure to – Or the condition of the documents when they were handed over. I'm not aware of any complaint. It doesn't show up in the record. It doesn't show up in the briefing in this case. They had full access to the same materials we did. We used those documents to determine – to prepare our charts and summaries, to prepare our expert reports, and that's where the computations are made. Now, let me see what else I can do by way of progress on our cross-appeal here. I know I'm probably right out of time. We do ask for additional fees and costs in connection with the first set of appeals. The village says, well, you weren't successful in that first appeal, first to this court and then to the Supreme Court. But what the village overlooks is that an appeal is considered to be a continuation of the same litigation. And you don't break down the litigation into isolated pieces and say, well, you're the pervading party here and you're the not pervading party here. It's all one piece of litigation. The court has to look at prevailing party status with respect to the litigation as a whole. And that's what we were, and that's why we're entitled. And we said to the check case in the briefing here, which involved an appeal where the plaintiff's damages were reversed on appeal or reduced on appeal. And the first district held where the plaintiff is still the prevailing party, still entitled to fees and costs in connection with that very appeal. So the very fact that we were not entirely successful, and I guess there's an issue as to who was successful on the earlier appeals or not, but even if we were not entirely successful, we're still a prevailing party in the litigation.  Are you asking for remand for sharing on attorneys' fees? No. We're asking for remand limited to the fees and costs in connection with this appeal. Just this appeal? Just this appeal. We've already determined and submitted our fees and costs with respect to the earlier appeals and the remand proceedings. Would this court be capable or qualified to determine fees if we had to on appeal? I think you have that power. We could submit our fee statements with respect to this appeal to this court if the court were so desirous. But I haven't seen that many appellate courts that are willing to go through that exercise. But I invite you to do that if that makes sense to you, Your Honors. I guess my time is up, so I will just adjourn. Sit down. Thank you. Thank you. All right. Thank you for your arguments here today. We will take the decision under advisement.